IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs February 5, 2002

## RODNEY D. PALMER v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-23950     Chris Craft, Judge**

———————————————

**No. W2001-01571-CCA-R3-PC  - Filed June 28, 2002**

———————————————

A Shelby County jury convicted the Petitioner of attempted second degree murder, a Class B felony, and three counts of aggravated assault, a Class C felony. The trial court ordered the Petitioner to serve an effective twenty-six-year sentence in the Tennessee Department of Correction. This Court affirmed the Petitioner's convictions on appeal, and the Tennessee Supreme Court denied permission to appeal. The Petitioner filed a petition for post-conviction relief. Following a hearing, the court denied post-conviction relief. The Petitioner now appeals the denial of post-conviction relief. Finding no error, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and DAVID G. HAYES, JJ., joined.

Robert Little, Memphis, Tennessee, for the Appellant, Rodney D. Palmer.

Paul G. Summers, Attorney General and Reporter; Kim R. Helper, Assistant Attorney General; William L. Gibbons, District Attorney General; and Katrina Earley, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

A Shelby County jury convicted the Petitioner, Rodney Palmer, of attempted second degree murder, a Class B felony, and three counts of aggravated assault, a Class C felony. He was sentenced to ten years in the Department of Correction as a Range I, standard offender for the attempted second degree murder conviction and to eight years as a Range II, multiple offender for each aggravated assault conviction. The ten-year sentence and two of the eight-year sentences are consecutive to each other, and the remaining eight-year sentence is concurrent for an effective twenty-six year sentence. This Court affirmed the Petitioner's convictions on appeal. See State v. Palmer, 10 S.W.3d 638 (Tenn. Crim. App. 1999). The Tennessee Supreme Court denied permission to appeal. Subsequently, the Petitioner filed a petition for post-conviction relief. Following

appointment of counsel, the Petitioner filed an amended petition. After a hearing, the court denied post-conviction relief. The Petitioner now appeals the denial of post-conviction relief.

The facts of the underlying case, as stated by our Court on appeal, are as follows: Belinda Palmer, the defendant's wife, testified that in February 1997, she lived with the defendant, her two sisters, Tameka and Tracy Parsons, and her cousin, John Gross. She said that she was in the hospital for two weeks in October 1996 following gastro-bypass surgery and that she returned to the hospital for seven days in January 1997. She said that on Friday, February 14, 1997, she had not yet returned to work after getting out of the hospital. She said that she believed that the defendant smoked crack cocaine purchased with his income tax refund over that weekend from Valentine's Day until she saw him on Monday night or early Tuesday morning.

Mrs. Palmer testified that at 8:00 a.m. on Tuesday, February 18, the defendant asked her to take him to work, but she refused and told him to leave. She said that she was in the bathroom when the defendant stabbed her in the chest, back, and arm. She said that either just before or as he was stabbing her, the defendant said, "B**ch, I'm going to put you in the Med." She said that after he stabbed her, she lay on the bathroom floor in shock and yelling. She said that she has scars from all three wounds and that she has nightmares about the incident.

Tameka Parsons testified that she lived with her sister, Mrs. Palmer, and the defendant in February 1997. She said that the defendant left the house Friday night, February 14, and returned early Tuesday morning around 2:00 a.m. She said that between 8:00 and 8:30 a.m., she heard Mrs. Palmer and the defendant arguing in the master bedroom. She said that Mrs. Palmer had been on the telephone that morning with her father telling him that she was tired of the defendant spending his money on drugs and that she wanted him out of her house.

Tameka Parsons testified that she then heard Mrs. Palmer yelling and that she thought that Mrs. Palmer and the defendant were fighting, but she did not know that he was stabbing her. She said that she and her sister, Tracy Parsons, kicked open the bedroom door and that the defendant came out of the bedroom and stabbed them. She said that he first stabbed her on her arm and under her arm, using a large kitchen knife. She said that she and her sister did not fight with the defendant or say anything to him before he stabbed them. She said that her sister pulled her from the hall into her room, and they closed the door. She said that she kicked the door open in order to help Mrs. Palmer.

John Gross testified that in February 1997, he lived on Janssen Street with Mrs. Palmer. He said that at that time, Mrs. Palmer was sick and was having complications from surgery. He said that on the morning of February 18, Mrs. Palmer called her father and told him that the defendant had not been there over the

previous weekend, that she was tired of it and did not want to live like that anymore, and that she wanted to get a divorce. He said that Mrs. Palmer asked the defendant to leave, and the defendant responded that he was not going anywhere. He said that the defendant and Mrs. Palmer began to argue heatedly in the living room, and they moved to the master bedroom at the defendant's request. He said that the defendant locked the bedroom door.

Mr. Gross testified that he could hear Mrs. Palmer yelling. He said that he was standing behind Mrs. Palmer's sisters when they kicked the bedroom door open. He said the defendant came toward the sisters with a large chef's knife and began stabbing them. He said the knife was six inches long and about two inches wide. He said that the sisters did not say anything to the defendant before the stabbing nor did they have anything in their hands.

Mr. Gross testified that he turned and ran outside onto the porch intending to get help. He said that the defendant ran after him and stabbed him once in the right shoulder. He said that he had not said anything to the defendant before the defendant stabbed him and that he was on the cordless telephone trying to get help. He said the defendant then entered the house, grabbed Mrs. Palmer's purse and car keys, and drove away in her car. He said that he did not know if the defendant took the knife with him when he left. He said that he lost a lot of blood from the stab wound and that he was treated and released from the hospital.

Tracy Parsons testified that on the morning of February 18, 1997, she was at Mrs. Palmer's house. She said that the defendant and Mrs. Palmer first argued in the living room. She said that they were loud but that she was not paying attention to what they were arguing about. She said they went into the bedroom and Mrs. Palmer started yelling. She said that she and her sister, Tameka Parsons, kicked the door open and that she could see Mrs. Palmer gasping for breath on the floor of the bathroom connected to the master bedroom. She said that within a few seconds, the defendant stabbed her and her sister. She said that she was stabbed in the chest and in the upper back. She said that she did not have anything in her hands and did not say anything to the defendant before he stabbed her.

Tracy Parsons testified that she is four feet, eleven inches tall and that she weighs one hundred fifteen pounds. She said that she was in the hospital for three days after the defendant stabbed her. She said that her lungs collapsed and that a chest tube was inserted through her side.

On cross-examination, Tracy Parsons testified that when they kicked the bedroom door open, Tameka was closer to the defendant. She said that the defendant came out of the bedroom as soon as the door opened. She said that the hallway was wide enough for the defendant to pass through even though she and Tameka were standing

there and that she was only partially blocking the doorway. She said that the defendant stabbed her first in the chest, then he stabbed her back as she was turning away from him. She said that the defendant then went down the hall and into the living room. She said that she and Tameka went into Tameka's bedroom and closed the door. She said she saw the defendant come out the front door, go back in the house, and come out again with keys. She said that she did not see or hear him attack anyone after he went back in the house.

Officer Russell Stevens of the Memphis Police Department testified that he was on duty the morning of February 18, 1997, and that he received a call to go to 4452 Janssen. He said that when he arrived, two ambulances were already on the scene, and attendants were taking two females from the house. He said that he saw a bleeding male outside, and a paramedic advised him that three people were critically injured.

Officer Stevens said that he went inside and saw Mrs. Palmer lying in the middle of the living room floor on her side. He said that he could see that she was bleeding from her upper body but that a pillow drenched with blood blocked his view of the wound. He said that Mrs. Palmer was talking on the telephone, trying to get someone to take care of her children and that she was hysterical. He said that Mrs. Palmer told him that she had been fighting with the defendant in the master bedroom and that the fight had escalated. He said that she told him that the defendant said, "You're a smart b**ch. I'm going to send you to the Med" and then he stabbed her.

Officer Stevens said that in the master bedroom, he found a dayplanner on the bed. In the dayplanner, he found the defendant's identification and a glass cylinder used to smoke crack. He said that the door to the bedroom appeared to have been kicked or forcibly pushed open.

The defendant testified that in 1991 he received a one-year sentence for reckless endangerment and a two-year sentence for theft. He said that on February 18, 1997, he lived at 4452 Janssen with his wife, her two sisters, and her cousin. He said that at that time, he had been working at Jolly Royal Furniture for eight months. He said that on Friday, February 14, he went home after work, stayed at his house for three to four hours, and then went to his mother's house. He said that he left because his wife's sisters and cousin and some other people were preparing to have a party funded by their income tax refunds. He said that he had received his paycheck that day, not an income tax refund. He said that Mrs. Palmer had returned to work two weeks earlier and that she had just gotten home from work when he left. The defendant stated that he smoked crack that weekend.

The defendant testified that Mrs. Palmer picked him up at his mother's house at about 12:35 p.m. or close to 1:00 a.m. on Tuesday. He said that he awoke at 6:30 or

-4-

7:00 a.m. and prepared for work. He said he asked Mrs. Palmer to take him to work, and they began to argue because she refused to take him to work and told him that she wanted him out of the house. He said that they argued for about twenty minutes starting in the living room and then continuing in their bedroom where he locked the door. He said that when he realized that they could not come to an understanding, he went to get the car keys from Mrs. Palmer's purse, which was hanging on the back of the bedroom door. He stated that Mrs. Palmer grabbed him around the waist to try to stop him from leaving in the car. He said that he and Mrs. Palmer then got into a physical fight and that when her sisters and cousin heard them bumping into things, they kicked open the bedroom door.

The defendant testified that when Mrs. Palmer's sisters and cousin started toward him, he grabbed a steak knife from the dresser or from a chair in the bedroom. He said that he had not put the knife there. He said that Mrs. Palmer was still holding him around the waist with her shoulder in his stomach pushing him backward into the bed. He said that as the others rushed into the room, he stabbed Mrs. Palmer in the back. He said that Tameka and Tracy got on him and he stabbed them.

The defendant testified that he then ran to the back door in the kitchen. He said that Mr. Gross was running in front of him and that he went to the back door to avoid Mr. Gross, who went to the front door. He said that the back door was locked and that he went back to the bedroom to get the keys to the door and the car. He said that Tameka and Tracy were no longer in the bedroom. He said that he got the keys, asked Mrs. Palmer if she was alright, and ran to the front door. He said that Mr. Gross was blocking the front door and he stabbed Mr. Gross. He said he then left in his and Mrs. Palmer's car. He said he tried to use the cellular phone to call 9-1-1 but that 9-1-1 was not accessible in that area. He said he then called Mrs. Palmer's father and asked him to come to the house and check on everyone. He said that three or four days later he turned himself in to the police.

On cross-examination, the defendant testified that Mrs. Palmer's three-year-old daughter and Tameka's baby were also in the house at the time of the incident. He admitted that on that morning, he and Mrs. Palmer argued in part over his drug use. He said that he did not have the knife until all four people came in the bedroom and that as he was stabbing them, they were still attacking him. He said that at the time Tracy attacked him, he had not yet stabbed Tameka. He admitted that he stabbed Mr. Gross in the back. He said it was necessary to stab the victims because he thought that he was being attacked. He said that he did not know if anyone had anything in their hands when they attacked him. He said that he did not have to go the hospital after the incident and that he was treated by his mother. He said that he was five feet, eleven inches tall and weighed one hundred seventy pounds.

At the hearing on the petition for post-conviction relief, the Petitioner testified that he did not meet with trial counsel until the Friday prior to the Monday that his case was supposed to go to trial. The Petitioner testified that prior to that meeting, he had not met with trial counsel since October. (The record indicates that Petitioner's trial was in February, 1998.) According to the Petitioner, when he met with trial counsel, she stated that she "already had a case prepared . . . to go to trial" and that she was going to argue the lesser-included offense of aggravated assault. The Petitioner testified that he was "set up" and stated that he gave trial counsel "papers of conspiracy," but trial counsel just "folded [them] up and said that [was not] what she was going to do."

The Petitioner explained that he wanted to argue that three of the State's witnesses, the victim's two sisters and the victim's cousin, had conspired against him and that he was merely acting in self-defense. The Petitioner testified that he wanted to present evidence on self-defense, but "by the time they presented the things that they was going to do, [the trial judge] didn't want to hear it." The Petitioner recalled that trial counsel "brought up the issue" of self-defense, but the trial judge stated that he had not heard enough evidence for it to be "played" in the courtroom.

The Petitioner testified that trial counsel did not cross-examine any witnesses regarding self-defense and stated that the only time that self-defense was discussed was when trial counsel was examining the Petitioner. Thus, the Petitioner maintained that "by the time it got to [him] there wasn't enough evidence to even say self-defense." The Petitioner stated that he was not able to convey his conspiracy theory to the jury because trial counsel "was already prepared to do the thing that she wanted to do." The Petitioner did not deny stabbing the victims in this case. Instead, he maintained that trial counsel asked him specific questions at trial and did not give him "an opportunity to explain [himself]."

The Petitioner testified that he met with trial counsel only once before trial. However, he stated that he met trial counsel when "she took the case." The Petitioner testified that when trial counsel took his case, she "went over the case" with him and talked to him about a bond hearing. The Petitioner reported that he saw trial counsel before the bond hearing and told her that his wife wanted to speak to her, but trial counsel stated that meeting with the victim would be a conflict of interest. According to the Petitioner, trial counsel stated that she would not interview the victims.

The Petitioner also testified that he did not see any discovery materials until the day of his trial. The Petitioner stated that trial counsel did convey the State's forty-year offer to him. The Petitioner explained that at the bond hearing, trial counsel brought it to the State's attention that it was mistaken in relying on certain convictions that the Petitioner did not have. The Petitioner acknowledged that he was sentenced to twenty-six years instead of forty years. When questioned if the Petitioner thought that he might have "gotten off entirely" if his evidence had been presented, the Petitioner stated, "No, I'm not saying that at all." The Petitioner testified, "No, I don't think they would have acquitted me, but I don't think that they would have went to the assumption that I deliberately got up one morning and started stabbing my family, who[m] I love very much."

When asked if he had any complaints about trial counsel's performance at his sentencing hearing, the Petitioner testified that he did not understand why trial counsel and the trial judge "agreed to take the cases as one case and then at the end of the trial they decided to split it up." The Petitioner testified that trial counsel only discussed "ranges" with him before trial and did not discuss his possible sentence.

The Petitioner stated that he "never got a proper self-defense trial." He testified that trial counsel did not discuss his case or the law with him. The Petitioner testified that he was interviewed by a psychiatrist, but trial counsel did not examine the psychiatrist at trial. The Petitioner stated that trial counsel did not present enough evidence to argue self-defense.

On cross-examination, the Petitioner estimated that trial counsel met with him three times while he was in jail. The Petitioner testified that trial counsel never discussed his preliminary hearing with him. He stated that the only times that he and trial counsel "really" talked about his case was when they discussed the bond hearing and when they met on the Friday "prior to" the Monday trial. The Petitioner testified that he had a copy of the indictment, but trial counsel did not go over it with him.

The Petitioner testified that on the Friday before trial, he gave trial counsel a folder containing paperwork that the Petitioner believed would show "conspiracies and self-defense," but trial counsel told the Petitioner that it was too late for such information. According to the Petitioner, the paperwork that he gave her included statements by his wife and "affidavits that were presented to [him]" which would have shown trial counsel "why [the Petitioner] thought that this was self defense [and "why this defense"] would work in trial." The Petitioner testified that he did research in the jail library and gave trial counsel information on conspiracy and self-defense.

Trial counsel testified that she had been employed at the Public Defender's Office for eleven years and that she was assigned to the capital-defense team. She stated that she was appointed to represent the Petitioner on July 22, 1997. Trial counsel testified that not counting the trial, she met with the Petitioner at least four times when the Petitioner had "report dates." One of those occasions was the bond hearing. Trial counsel stated that she believed she visited the Petitioner twice in jail and spoke with him on the telephone twice. Trial counsel recalled that during those meetings, she spoke to the Petitioner about his case.

Trial counsel testified that she received discovery a couple of weeks after receiving the case and that on August 22, 1997, she reviewed the discovery materials, as well as the preliminary hearing file. Trial counsel stated that she also reviewed with the Petitioner the interviews of three of the victims, including that of the Petitioner's wife. Trial counsel did not recall whether she told the Petitioner that she had or had not interviewed his wife. She stated that because the Petitioner's wife was interviewed when the Petitioner was in General Sessions Court, trial counsel did not know if she asked the investigator to question her again. In addition, the Petitioner's wife made a statement to the police. Trial counsel maintained that she shared all of the discovery materials with

the Petitioner; however, she stated that she did not believe that the witness statements were included in the discovery materials until after the witnesses testified at trial.

Trial counsel testified that she was "sure" that she spoke to the Petitioner about possible defenses. She explained that the papers that the Petitioner said he gave to trial counsel on the Friday before his trial "were kind of like notes that he had written down." According to trial counsel, the notes included some case law and the Petitioner's thoughts as to how the State's proof fit into that case law. Regarding the Petitioner's conspiracy theory, trial counsel told the Petitioner that it "was not going to fly in this trial." However, trial counsel told the Petitioner that they could try to argue self-defense or the lesser charge of aggravated assault.

Trial counsel stated that the State made the Petitioner an offer of forty years; however, trial counsel notified the State that the Petitioner was a Range I offender. The State did not make another offer. Trial counsel testified that the Petitioner ultimately received a sentence of twenty-six years. Although trial counsel contacted a psychologist to evaluate the Petitioner, the psychologist was not examined at trial because he had determined that the Petitioner was competent to stand trial and that there were not any insanity defenses.

Trial counsel could not recall if she went over sentencing with the Petitioner. She noted that "early on," they went over ranges, and she explained to him that he was a Range I. Trial counsel also stated that she "tell[s] all [her] clients if they [have] multiple indictments they can get stacked time." However, she did not have any specific notes as to what she told the Petitioner.

Trial counsel testified that she could not remember if she argued the theory of self-defense at the Petitioner's trial and stated that it was "very possible" that she did not. She stated that if the judge was not going to charge it, it did not make sense to argue it.

Trial counsel could not recall if she moved to sever the Petitioner's offenses. Trial counsel could also not recall if she filed a response to the State's written motion to sentence the Petitioner consecutively. Trial counsel testified that she did not argue that the Petitioner's drug use diminished his ability for intent or that it was a mitigating factor because "he had already slept it off and then the next day . . . is when it happened."

## ANALYSIS

### A. Ineffective Assistance of Counsel

The Petitioner argues that he received ineffective assistance at trial. Specifically, the Petitioner argues that trial counsel was ineffective by not properly pursuing a claim of self-defense. In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-203. The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. Id. § 40-30-210(f). A post-conviction court's factual

findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which is overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. Id. at 457. The Tennessee Supreme Court has held that the issue of ineffective assistance of counsel is a mixed question of law and fact and, as such, is subject to de novo review. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution. Id.; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). This right to representation includes the right to "reasonably effective" assistance. Burns, 6 S.W.3d at 461. In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and that this performance prejudiced the defense, resulting in a failure to produce a reliable result. Id. at 687; Cooper v. State, 849 S.W.2d 744, 747 (Tenn.1993). To satisfy the requirement of prejudice, a petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the petitioner's guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Id. at 694; see also Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994).

This standard also applies to claims arising out of the plea process. Hill v. Lockhart, 474 U.S. 52, 58 (1985). To satisfy the requirement of prejudice in a case involving a guilty plea, the petitioner must demonstrate a reasonable probability that, but for counsel's errors, he or she "would not have pleaded guilty and would have insisted on going to trial." Id. at 59.

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. Strickland, 466 U.S. at 690; State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. Strickland, 466 U.S. at 690; Cooper, 849 S.W.2d at 746; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980).

The Petitioner argues that trial counsel was deficient by not properly pursuing his claims of self-defense and conspiracy. The post-conviction court, in its order denying relief, stated,

A reading of the trial transcript reveals that the [P]etitioner made a terrible witness, particularly on cross-examination, when he was asked questions concerning his version of the offense which he could not answer or explain. From the physical evidence and facts of the case, this Court cannot see it possible that any jury could ever believe the vicious, brutal stabbing of these four unarmed victims could ever have been committed in self-defense. As an example, John Gross, was stabbed in the back as he turned away, per the [Petitioner's] testimony at trial, guilty only of blocking a doorway. [The] Petitioner's attorney asked the trial judge to charge self-defense, but was refused that instruction, due to the lack of self-defense proof in the record. She testified in the hearing that she could not in good conscience argue self-defense to the jury if they were not going to be instructed on it. Instead, she argued that he did not intend to kill, but only injure, and asked for convictions on the lesser-included offense of [a]ggravated [a]ssault, in fact succeeding in getting three of [the] [P]etitioner's indicted charges reduced to that offense. She also had all of the witnesses interviewed by her investigator except Tamicka [sic] Parsons, who refused to be interviewed. [The] Petitioner has suggested nothing additional that his attorney could have done to investigate or prepare for trial than what was already done in this case. In this Court's opinion, his attorney did the best she could with very few facts in [the] [P]etitioner's favor.

In our view, the findings of the post-conviction court are fully supported by the evidence presented at the post-conviction hearing and in by record on appeal. The only evidence that the Petitioner offered in support of his contention that he stabbed the four unarmed victims in self-defense was his own testimony. In addition, his theory that the four victims conspired against him was also unsupported at trial. We agree with the post-conviction court that the Petitioner "suggested nothing additional that his attorney could have done to investigate or prepare for trial than what was already done in this case." This issue is without merit.

### B. Application of Tennessee Rule of Evidence 615

The Petitioner next argues that the trial court erred by denying his motion to exclude trial counsel from the courtroom during his testimony. Tennessee Rule of Evidence 615 provides that "[a]t the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing." However, the rule does not authorize the exclusion of "a person whose presence is shown by a party to be essential to the presentation of the party's cause." Tenn. R. Evid. 615. "The party seeking to avoid sequestration bears the burden of proving that a Rule 615 exemption applies." El Paso Pitts v. State, No. W2001-01563-CCA-R3-PC, 2002 Tenn. Crim. App. LEXIS 353, at *9 (Tenn. Crim. App., Jackson, Apr. 17, 2002) (citing United States v. Ortiz, 10 F. Supp.2d 1058, 1060 (N.D. Iowa 1998)). Application of Rule 615 is within the sound discretion of the trial court. State v. Harris, 839 S.W.2d 54, 68 (Tenn. 1992).

In this case, appellate counsel, at the beginning of the hearing on the petition for post-conviction relief, requested that all witnesses, including trial counsel, be excluded from the

courtroom pursuant to Tennessee Rule of Evidence 615.  The post-conviction court denied the Petitioner's request and ruled that trial counsel was "an essential witness for the [S]tate."  In allowing trial counsel to remain in the courtroom, the post-conviction court noted that trial counsel is "familiar with her file and it would be a great help to the state to understand this and the issues, if [trial counsel] were to hear the testimony."

We conclude that the post-conviction court did not abuse its discretion in allowing trial counsel to remain in the courtroom during the Petitioner's testimony.  Our Court has previously stated, "Given the special circumstances which arise in a post-conviction proceeding in which a petitioner claims that his trial attorney was ineffective, it is entirely reasonable to conclude that the trial attorney's presence would be essential for the presentation of the state's case." State v. Jerome Brown, No. 03C01-9107-CR-00201, 1992 Tenn. Crim. App. LEXIS 761, *22 (Tenn. Crim. App., Knoxville, Oct. 6, 1992).  Moreover, even if the post-conviction court's ruling qualified as an abuse of discretion, the Petitioner has failed to articulate any  prejudice.  Thus, this issue is without merit.

Accordingly, the judgment of the post-conviction court is AFFIRMED.

_____
ROBERT W. WEDEMEYER, JUDGE