# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs November 27, 2012

## SHAVON PAGE v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Knox County**
No. 93243      Bob R. McGee, Judge

_____

**No. E2012-00421-CCA-R3-PC - Filed January 7, 2012**

_____

The Petitioner, Shavon Page, pled guilty to five counts of especially aggravated kidnapping, three counts of aggravated rape, two counts of aggravated sexual battery, two counts of aggravated robbery, and one count of aggravated burglary, in exchange for an effective sentence of thirty years, to be served at 100%. The Petitioner filed a timely petition for post-conviction relief, alleging that he had received the ineffective assistance of counsel. On appeal, the Petitioner contends first that the post-conviction court erred when it denied his request, pursuant to Tennessee Rule of Evidence 615, to have his trial counsel excluded from the courtroom during the post-conviction hearing. He next contends that the post-conviction court erred when it dismissed his petition because his trial counsel was ineffective for failing to adequately investigate his case, which rendered the Petitioner's guilty plea unknowingly and involuntarily entered. After a thorough review of the record and applicable authorities, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

William J. Taylor, Knoxville, Tennessee, for the appellant, Shavon Page.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; Randall Nichols, District Attorney General; and Philip Morton and Eric Counts, Assistant District Attorneys General for the appellee, State of Tennessee.

## OPINION
### I. Facts

## A. Guilty Plea

This case arises from a home invasion during which the victims[1] were robbed and the female victim was repeatedly raped. The Petitioner and two co-defendants, Dameion Nolan and Michael McMahan, were indicted on charges involving kidnapping, rape, sexual battery, robbery, and burglary. At the guilty plea submission hearing, the State provided the following basis for the guilty plea:

Your Honor, the proof would show through the witnesses listed on the indictment, that on June the 3rd, 2007, these two defendants along with a codefendant by the name of Damien [sic] Nolan, who has already pled guilty in these matters, about 1:30 in the morning approached the residence belonging to [Victim 1 and Victim 2] . . . in Knox County.

All three of these individuals, in particular these two defendants, [the Petitioner] and McMahan, gained entry by forcing open a rear door leading into a basement area of the [victims'] home.

All three of these defendants, specifically [the Petitioner] and Mr. McMahan, were armed with handguns. And after entering the home made their way up a flight of stairs into the main living area of the [Victims'] home.

All three armed defendants then entered the bedroom of the victims, . . . where they were both in their bed asleep. And he was awakened, [Victim 1] was struck in the head with a gun and pistol whipped by these defendant acting in concert.

They were forced out of their bed at gunpoint, ordered to lay down on the bedroom floor on a rug that was adjacent to the bed. Very early on in this encounter [Victim 2] was forced to remove her clothing. Both victims were thereafter tied up with belts found among the victims' clothing in the bedroom.

All three defendants managed to know where the victims' kept their money. [Victim 1] at one point indicated that he kept his credit cards in a downstairs office, and offered to give those credit cards to the defendants.

Mr. McMahan and Mr. Nolan thereafter escorted [Victim 1] at gunpoint

---

[1]Because of the nature of this case, we will refer to the victims hereinafter as "Victim 1" and "Victim 2"

to his downstairs office where he gave Mr. Nolan and Mr. McMahan his credit cards. In particular one bank card together with the pin number for . . . the bank card that he uses at SunTrust Bank.

While downstairs at some point in time, these defendants acting in concert also stole from [Victim 1] a collection of state quarters valued at approximately $3,000 and used one of [Victim 1's] camera bags to conceal and ultimately remove these quarters from the home.

While Nolan and McMahan confined [Victim 1] downstairs, [the Petitioner] still in the bedroom with [Victim 2], confined her there at gunpoint and forced her to perform oral sex on him at gunpoint.

During the course of that [the Petitioner] ejaculated inside [Victim 2's] mouth leaving DNA material that caused [Victim 2] to be on the verge of throwing up. When she reported that to [the Petitioner] that she was about to throw up, he made statements to the effect, "if you throw up, I'll blow your head off."

[Victim 1] was ultimately returned to the bedroom at gunpoint and forced to lie down on the floor and watch as [Victim 2] was forced at gunpoint to have oral sex with the other two defendants. During the sexual encounter [with] these two defendants, Defendant McMahan and [the Petitioner], attempted vaginal rape initially by touching the vaginal area with the finger and later attempting to penetrate with the penis. But this act was not completed.

At one point [Victim 2] was removed at gunpoint to a downstairs area to show all three of these defendants where the surveillance camera's power switch was, and was forced to turn it off.

While in the bedroom, all of the defendants, while armed with and using deadly weapons, forced [Victim 2] to show them where her jewelry was within the bedroom closet area. She showed them and turned over items of jewelry to them as demanded.

This entire ordeal and confinement lasted in excess of two hours, during which these defendants, in particular Mr. McMahan and [the Petitioner], repeatedly ordered these victims not to move or talk or that they would blow their heads off.

-3-

The defendants eventually fled out the bedroom door onto a patio, a deck area, and through an obscured patio door onto the ground and into a waiting car.

At approximately 4:04 a.m. that same morning at a SunTrust Bank on Cedar Bluff Road, Mr. Nolan is observed on a security camera using the victim's ATM card to withdraw $500.00. The cameras also captured the presence of two other individuals in the car.

Using these pictures, Damien Nolan was identified by witnesses as the driver of the car and the person that used the ATM card to withdraw this money.

Mr. Nolan gave the names of [the Petitioner] and Michael McMahan as two individuals with whom he had been that night.

The car driven by Mr. Nolan was later searched pursuant to the search warrant and a ring belonging to [Victim 2] was found inside the glove compartment.

On June 5th, 2007, a heart shaped pendant belonging to [Victim 2] was recovered from Charlie's Pawn Shop on Kingston Pike. She later positively identified that item as belonging to her, and one of the items that was taken during this home invasion.

DNA samples eventually were collected from all three of the defendants, and compared against the evidence obtained during the processing of the crime scenes, specifically the rug area where [Victim 2] was able to spit out the substance in her mouth onto the rug, there was blood on that rug that came back to [Victim 1] from where he had been hit in the head and cut and bled on that rug. There was semen evidence from Mr. McMahan and [the Petitioner] isolated from the examination of the rug and bed sheet [o]n the floor also.

The swabs indicated the sperm of [the Petitioner] and Mr. McMahan in these samples from the rug and the sheets. And that DNA sample matched [the Petitioner] and McMahan to the conclusion of anyone else in the world.

The defendants were later taken into custody. A brief interview was had with [the Petitioner], he acknowledged receiving $160.00 of the $500.00

-4-

taken from the use of the debit card but denied any other involvement in this home invasion.

The Petitioner agreed that these are the facts that the State would prove had the case gone to trial, he was not on any medications, and he understood his constitutional rights and the ramifications of pleading guilty. Then, based upon this evidence and the Petitioner's acknowledgments, the trial court accepted the Petitioner's plea of guilty to five counts of especially aggravated kidnapping, three counts of aggravated rape, two counts of aggravated sexual battery, one count of aggravated robbery, and one count of aggravated burglary, in exchange for an effective sentence of thirty years, to be served at 100%.

## B. Post-Conviction Facts

The Petitioner filed a petition for post-conviction relief, contending that he had received the ineffective assistance of counsel because his trial counsel did not adequately investigate his case. The hearing on the petition,[2] was divided into three sets of proceedings: first, those proceedings relevant to Petitioner Nolan; second, those proceedings relevant to Petitioner McMahan; and third, those proceedings relevant to the Petitioner. The Petitioner's counsel during the guilty plea hearing ("Counsel") testified twice, first during the proceedings that were relevant to Petitioner McMahan. When he so testified, he stated that he represented the Petitioner during the Petitioner's guilty plea hearing and that the Petitioner had entered his guilty pleas at the same time as Petitioner McMahan. Counsel said that he discussed with the other attorneys and the Petitioner that, because the convictions were for a "violent sexual offense," the defendants, including the Petitioner, were going to be "supervised for the rest of [their] li[ves]." He said he discussed this with the Petitioner " [at] length . . . [and] [i]n depth."

Before the proceedings relevant to the Petitioner, the Petitioner asked that Counsel be excluded from the court room while the Petitioner testified, citing Tennessee Rule of Evidence 615. The State argued that Counsel was the State's designated representative and that, under the rule, he was allowed to remain in the courtroom. The trial court ruled that Counsel could remain in the court room.

The Petitioner then testified that he had achieved the ninth grade in school, through special classes, but he said he did not do well in school because he had trouble reading and spelling. He said he still had trouble understanding some words. Counsel then asked the

---

[2]The trial court held a combined hearing on the post-conviction petitions of all of the co-defendants in this case, including the Petitioner, McMahan, and Nolan. We have excluded testimony presented at the hearing that was relevant only to the petitions of each of the other defendants.

Petitioner if he had any "recollection" of being analyzed by a psychologist while in school, and the Petitioner said he did not know what the word "recollection" meant.

The Petitioner, who was eighteen at the time of these crimes, said that his family retained Counsel to represent him, and he first spoke with Counsel while he was in jail. The Petitioner said his first meeting with Counsel lasted between five and ten minutes, during which Counsel asked the Petitioner questions about the case. The Petitioner said the next meeting did not occur until after his bond had been revoked. Counsel came to see him and brought him a discovery packet. The Petitioner said the two did not discuss the evidence against him, including DNA evidence, or any witnesses who would testify against him.

The Petitioner said he met with Counsel on two or three occasions before he entered his guilty plea. He said that, at first, Counsel encouraged him to plead guilty in exchange for a twenty-five year sentence. The Petitioner said he initially declined this offer because he felt it was too much time for him to serve. The Petitioner said he and Counsel discussed this plea deal again, and Counsel explained that he would be eligible for parole after serving twenty-five years. The Petitioner said, at the time, his mother had told him about an eighteen-year sentence that she had discussed with Counsel. The Petitioner said he asked Counsel about the possibility of an eighteen-year-sentence, but Counsel "blew [him] off."

The Petitioner said that he met with Counsel one more time before entering his guilty plea. Counsel had some papers with regard to the plea agreement that he wanted the Petitioner to sign. The Petitioner identified his signature on the documents but said he did not read the papers and did not recall seeing many of the documents. He further said that Counsel did not read the papers to him. The Petitioner testified that Counsel only gave him the signature page of the documents relating to his plea agreement and that he never saw the other pages attached to the signature page.

The Petitioner testified that he did not recall telling the trial court during his guilty plea hearing that he had read the plea agreement or that it had been read to him. He said Counsel had told him to agree with what the trial court said during the hearing and to "say yes to everything" and that is what he did. The Petitioner said he did not know at the time what he was pleading guilty to or whether his sentence would be eighteen or twenty-five years. Under no set of circumstances did he think he would be required to serve his whole sentence of thirty years. He said that Counsel never discussed with him community supervision for life or that he would have to be listed on a sexual offender registry.

During cross-examination, the Petitioner testified that he did not read any of the documents related to his guilty plea. The Petitioner testified that his first name is spelled "Shavone." He said he did not see on the documents that his name was misspelled. The

Petitioner said, had he seen these documents, he would have corrected the spelling of his name. The Petitioner then identified his original petition for post-conviction relief, which he prepared with the assistance of an inmate lawyer. He conceded that he had read through the document and signed it despite the fact that his name was misspelled on that document as well.

The Petitioner agreed that, before these crimes were committed, he had been in "the juvenile system" for "quite a long time." He said he did not recall the offenses alleged against him while he was a juvenile, saying that he "got sent to juvenile for getting . . . kicked out of school and stuff like that."

The Petitioner said that, on the day he entered his guilty plea, Counsel told him to answer "yes" to all the questions asked of him. He then said he did not "remember" the portion of the guilty plea hearing during which he responded negatively when the trial court asked him during the hearing, "Has anybody threatened you in any way or promised . . . you anything to get you to plead guilty here this morning?" The Defendant said he also did not remember responding negatively when the trial court asked him if he had any "questions about anything at all."

The Petitioner said that Counsel had explained to him before the guilty plea hearing the charges that he faced, including kidnapping, rape, and robbery. The Petitioner said that Counsel never informed him that he had a right to a jury trial. The State then asked the Petitioner, "[A]re you saying that you didn't even commit these crimes?" The Petitioner responded, "No, I'm not saying that." He then said he was also not admitting that he did commit these crimes. The Petitioner said that Counsel told him about the DNA evidence against him and that his semen had been found on the victims' rugs and clothes. He agreed that this was "pretty strong evidence" against him. He agreed that the strength of the evidence against him was one of the reasons he pled guilty, but he maintained that the plea deal he agreed to was not the same deal that he thought that he agreed to accept. He said he had heard "two different stories [about the plea deal] from [his] mother and from [Counsel]." The Petitioner conceded, however, that the day of the guilty plea hearing he heard that he was agreeing to thirty years in prison. He said he was unaware that he would have to serve this sentence at 100%.

The Petitioner said that he also did not know at the time that he entered his guilty plea that he would have to be on community supervision for life. He said that he had never read the transcript of the guilty plea and that he did not remember when Counsel stated on the record, "That's the agreement, your Honor, though we'd add that, and we have it in the plea agreement I think for both defendants . . . [that] [i]t would also require them to be on the sexual offender registry for life."

During redirect examination, the Petitioner testified that Counsel never discussed with him any potential defenses he could present if he took his case to trial. The two never discussed whether Counsel had interviewed any witnesses in the case. He said Counsel never discussed with him the best case and worst case scenario if he took his case to trial.

Counsel testified that he had practiced criminal defense law exclusively for fourteen years, handling thirty-five first degree murder trials and 130 trials throughout the state, in both federal and state court. Some of these trials had resulted in the acquittal of his clients. He said he had represented "thousands" of criminal defendants while practicing law. Counsel testified that the Petitioner's family hired him to represent the Petitioner while the cases were still pending in juvenile court. Counsel said he spent "quite a bit of time" with the Petitioner going through the case. Counsel said the Petitioner's assertion that the two only met "two or three times" was "ridiculous," and he said the two met "a lot." Counsel said that he met with the Petitioner about bond issues and, as they got ready for what they thought was going to be a trial, they met "all the time." Counsel said he was "desperately trying to work out an arrangement where [the Petitioner] could enter a plea deal."

Counsel said that when he met with the Petitioner, while the Petitioner was incarcerated, the Petitioner's demeanor and appearance were different than they were at the post-conviction hearing. He described the Petitioner as "very articulate." Counsel said he asked the Petitioner whether the police would find fingerprints at the crime scene, and the Petitioner said "nope." He then asked the Petitioner if the witnesses would be able to identify him, and the Petitioner said, "No." Counsel said he later learned that the robbers had used gloves and masks. Shortly before the hearing to transfer the Petitioner from juvenile court, the State's attorney informed Counsel that the State had DNA evidence and that the evidence was not from saliva left at the scene but from semen. Counsel knew, at this point, that the Petitioner would not be successful in defending his case. Counsel became aware, also, that the State had semen DNA evidence from the Petitioner's co-defendant McMahan and that they had a picture of co-defendant Nolan using the victims' debit card at a bank.

Counsel said that, after learning about the State's evidence, he knew that the Petitioner's case "could not be won." Counsel said he communicated with both the Petitioner and the Petitioner's mother, attempting to help them understand that the Petitioner's case was not one that was winnable and that he was facing "horrendous, horrendous time if he went to trial and lost." Counsel said he informed the Petitioner and his mother "over, and over, and over again" that, if they went to trial and lost, the absolute minimum sentence he faced in Counsel's opinion was fifty years to be served at 100%. Counsel said that he explained to both the Petitioner and his mother that he did not think that the Petitioner would get the minimum sentence, in light of the Petitioner's juvenile record, which included adjudications of guilt for gun charges and drug charges. Instead, he thought the Petitioner might receive

the maximum sentence, which could have been more than 137 years. Counsel testified that, because of the Petitioner's potential exposure to such a long sentence, Counsel tried to negotiate a plea agreement.

Counsel said he investigated the facts of the case and was ready to proceed to trial, as indicated by his notes in the Petitioner's file. He said his notes contained even the Petitioner's clothing size, so Counsel could get him some clothing to wear for trial. Until the Sunday night before the trial was to start on Monday, the State's best offer was forty years, to be served at 100%. He discussed with the Petitioner the option of entering a guilty plea without a plea agreement with the State and allowing the trial court to sentence the Petitioner. At the last minute, Counsel was able to negotiate the plea to thirty years, to be served at 100%. Counsel said his notes indicate, "The [Petitioner's] mom now understands the problem. The plea is 30 years at a hundred percent. Everything's concurrent. McMahan gets 25." Counsel said that he went through the plea agreement "line by line" with the Petitioner and his mother on the Sunday before trial.

About the Petitioner's ability to read and understand the plea agreement, Counsel said he was "stunned" when he met the Petitioner after the Petitioner received the discovery in this case. He said that the Petitioner surprised him noting that there were some problems with some of the charges in the case, namely that Victim 2 could not affirmatively identify who committed some of the sexual offenses against her because he and his co-defendant were wearing masks. Counsel informed the Petitioner that, because he was four inches taller than his co-defendant, Victim 2 could distinguish them by size. Counsel said, however, the Petitioner knew the charges and knew his case.

Counsel recalled that he attended co-defendant Nolan's guilty plea submission hearing. He told the Petitioner's mother that he wished that she had also attended because he had never, "in over 130 trials . . . seen a victim that so moved the courtroom. And it was such that Mr. Nolan's family and friends that were there were all in tears." Counsel knew that Victim 2 would have made a credible witness if the Petitioner took his case to trial. Counsel said that, during the Petitioner's guilty plea hearing, Victim 2 did in fact testify. He recalled that her testimony was "incredibl[y] eloquent" and "disturbing" and "a nightmare for a defense lawyer to have a victim like that." During Victim 2's testimony, the Petitioner's mother began crying.

Counsel testified that the Petitioner was aware that his sentence involved lifetime supervision if and when he was released from prison because he was convicted of a violent sexual offense. Counsel testified he spent "an incredible amount of time" with both the Petitioner and his mother trying to explain why the Petitioner received the longest sentence. Counsel attempted to explain to them that Victim 2 said that the Petitioner was the one who

acted the worst during the commission of these crimes. Counsel attempted to further explain to them that the Petitioner was the one who had the gun and who held the gun to Victim 2's head and told her that if she spilled any of his sperm that he was going to "blow [her] f**king head off." Counsel said that the Petitioner was also the one who taunted Victim 1 and asked him "how does it feel to watch your wife do this?" Counsel said that he attempted to explain to the Petitioner that, because of his "terrible" actions, he received the longest sentence. Counsel said he spent "hours, and hours" that weekend talking to the Petitioner and his mother about the plea agreement.

During cross-examination, Counsel testified that he did not think that his office obtained an investigator in this case. He said that counsel for one of the co-defendants obtained an investigator but that they did not use the investigator's services after learning about the DNA evidence. Counsel agreed that, around the time of the plea hearing, he had a significant case load and was "pretty busy."

Counsel recalled that the State allowed co-defendant Nolan to plead before the other co-defendants. He said that Victim 2 had said that Nolan had "interceded at the end" and prevented additional rapes or even a shooting. The State, therefore, wanted co-defendant Nolan to get the benefit of that and allowed him to plead first. The State then offered to allow co-defendant McMahan to plead guilty in exchange for a twenty-five-year sentence. Counsel said his best offer from the State, at that time, was still forty years.

Counsel said his agreement with the Petitioner's mother when she retained him as counsel was that she would pay $10,000 if the Petitioner pled guilty and $20,000 if Counsel had to take the case to trial. Counsel estimated that he was paid a total of $5,000 or $6,000 for representing the Petitioner. Counsel said, regardless of payment, he was prepared for trial.

Counsel maintained that he went over every charge contained in the plea agreement and each document of the plea agreement "in detail." Counsel said he "[a]bsolutely" read the Petitioner's constitutional rights to him. Counsel said the Petitioner "understood as well as any client [he'd] ever had about evidence, about the charges, and about what we were doing." Counsel said this was a case that was "the perfect storm" because there was an "incredible victim, [and] . . . overwhelming evidence." Counsel said the Petitioner was lucky to get the sentence he got.

Counsel then expressed his desire that the post-conviction court grant the Petitioner post-conviction relief. He explained that the Petitioner received a good sentence at thirty years and, if he were granted post-conviction relief, he would likely get a sentence of more than 100 years. He said maybe that would send a message to people in the Petitioner's

position that filing a post-conviction petition after receiving a favorable deal is not, in fact, in their best interest. Counsel expressed his frustration that petitioners, like the Petitioner, are filing frivolous post-conviction petitions in hopes that the State will be too busy to fight the motions. Counsel said that, at the time of the agreement, he and the Petitioner were begging for the plea deal that they received, the Petitioner was happy with the plea agreement, and it was "just wrong" that the Petitioner would now try to have that deal negated through a petition for post-conviction relief.

Based upon this evidence, the post-conviction court dismissed the Petitioner's petition for post-conviction relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends first that the trial court erred when it allowed Counsel to remain in the courtroom while the Petitioner testified. He next asserts that Counsel was ineffective when representing him because he failed to adequately investigate the case.

## A. Counsel's Presence In Courtroom

The Petitioner contends that the trial court erred when it denied his request to have Counsel excluded from the courtroom during his testimony. He cites Tennessee Rule of Evidence 615, which states that "[a]t the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing." The Petitioner concedes that this rule does not authorize the exclusion of "a person whose presence is shown by a party to be essential to the presentation of the party's cause," but contends that Counsel's presence was not essential because his petition was based upon the fact that his plea was not entered into knowingly and voluntarily.

The State responds by first noting that the decision of whether to exclude Counsel is one left within the sound discretion of the post-conviction court. It then contends that the post-conviction court did not abuse its discretion in this case, citing multiple cases from this Court that stand for the proposition that, given the circumstances of a post-conviction petition, it is reasonable that the trial attorney's presence would be essential for the presentation of the State's case. *See e.g., Palmer v. State*, 108 S.W.3d 887, 898 (Tenn. Crim. App. 2002).

When ruling on this issue, the trial court found:

Well, I've been giving some thought to this and, you know, unless there's

some specific provision of the law to the contrary, it is just basic fundamental due process to allow a person who's being accused of something to face his accuser. And having no other guiding law to circumvent that, it would appear to me that it's just a matter of basic due process that the [Counsel] who's being accused of misconduct is allowed to confront his accuser. So I'll allow [Counsel] to stay.

This Court has previously held that under "'the special circumstances which arise in a post-conviction proceeding in which a petitioner claims that his trial attorney was ineffective, it is entirely reasonable to conclude that the trial attorney's presence would be essential for the presentation of the state's case.'" *Palmer*, 108 S.W.3d at 898 (citation omitted). This has been affirmed by other cases from this Court. *Frankie Donald Releford v. State*, No. E2004-00695-CCA-R3-PC, 2005 WL 697524, at *3-4 (Tenn. Crim. App., at Knoxville, Mar. 28, 2005), *no Tenn. R. App. P. 11 application filed*; *Norman Matthews v. State*, No. W2001-02895-CCA-R3-PC, 2002 WL 31370470, at *2 (Tenn. Crim. App., at Jackson, Oct. 18, 2002), *no Tenn. R. App. P. 11 application filed*.

The Petitioner attempts to distinguish his case from those cited above by stating that his claims were confined to the fact that his guilty plea was not knowingly and voluntarily entered and did not include an attack on Counsel's performance. We find this contention unpersuasive. The Petitioner contended during the hearing, and he maintains on appeal, that Counsel did not adequately investigate the facts of his case. This is precisely the type of argument which creates the "special circumstances" making it "entirely reasonable" to conclude that Counsel's presence was essential for the presentation of the State's case. *See Palmer*, 108 S.W.3d at 898. The Petitioner is not entitled to relief on this issue.

## B.  Ineffective Assistance of Counsel

The Petitioner next contends that he received the ineffective assistance of counsel because Counsel did not adequately investigate his case and did not explain the nature and extent of the charges the Petitioner was facing. The State counters that the Petitioner has failed to establish that he was denied the effective assistance of counsel.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge,

not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be

highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (internal quotations omitted).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the Strickland test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994). In the context of a guilty plea as in this case, the effective assistance of counsel is relevant only to the extent that it affects the voluntariness of the plea. Therefore, to satisfy the second prong of *Strickland*, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *see also Walton v. State*, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997).

Having thoroughly reviewed the evidence presented in this case, we conclude first that Counsel's representation was in no way deficient. The facts proving the Petitioner's guilt were overwhelming and included evidence of the Petitioner's semen at the crime scene. Counsel successfully negotiated a favorable plea agreement on behalf of the Petitioner, and the Petitioner was satisfied with the plea agreement at the time of the plea hearing. The Petitioner has also failed to prove that, but for Counsel's lack of further investigation, he would not have pled guilty. The Petitioner has not met his burden of proving either that Counsel was ineffective or that he suffered prejudice based upon Counsel's performance. Therefore, he is not entitled to relief.

### III. Conclusion

-14-

In accordance with the aforementioned reasoning and authorities, we conclude that the post-conviction court properly dismissed the Petitioner's petition for post-conviction relief. The post-conviction court's judgment is, therefore, affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE